J-A19038-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | | |
|---|---|---|---|
| L.M.V., | | : | IN THE SUPERIOR COURT OF |
| | | : | PENNSYLVANIA |
| | Appellant | : | |
| | | : | |
| | v. | : | |
| | | : | |
| A.T.D. | | : | |
| | | : | |
| | v. | : | |
| | | : | |
| M.R.D. | | : | No. 646 EDA 2020 |

Appeal from the Order Entered January 22, 2020
In the Court of Common Pleas of Lehigh County Civil Division at No(s):
No. 2019-FC-0692

BEFORE:  PANELLA, P.J., McLAUGHLIN, J., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.:                     **FILED MAY 12, 2021**

This appeal returns to this panel following our remand on November 3, 2020, for the trial court to prepare a supplemental opinion pursuant to Pa.R.A.P. 1925(a).  L.M.V. (Mother) appeals from the custody order entered in the Lehigh County Court of Common Pleas, pertaining to Mother and A.T.D.'s (Father's) child, J.R.D. (Child).[1]  The order awarded: (1) shared legal custody to Mother and M.R.D. (Paternal Grandmother), who is Father's mother; (2) primary physical custody to Mother; and (3) partial physical custody to Paternal Grandmother.  Mother avers the court: (1) erred in

_____

[1] Mother did not file an amended brief in response to the trial court's supplemental opinion.  Paternal Grandmother has not filed any brief in this matter.

granting Paternal Grandmother's petition to intervene pursuant to 23 Pa.C.S. § 5324; (2) failed to consider whether the custody order will interfere with the parent-child relationship, with respect to 23 Pa.C.S. § 5328(c); (3) failed to apply the presumption in favor of parent, pursuant to 23 Pa.C.S. § 5327(b); and (4) abused its discretion in awarding shared legal custody to Paternal Grandmother, under the 23 Pa.C.S. § 5328(a)(1)-(16) factors. After careful review, we affirm.

## I. Facts & Procedural History

Child was born in 2013; Mother and Father never married. At this juncture we note Mother has two additional children, a three year-old daughter and a one year-old son, with her paramour, J.W. Trial Ct. Op., 11/20/20, at 9. In its supplemental opinion on remand, the trial court summarized the underlying factual history:

> According to the testimony of [the August 7, 2019, standing] hearing, Child had attention deficit hyperactivity disorder ("ADHD"), was very aggressive and had a history of self-inflicted bruises. Paternal Grandmother was not employed. She was on oxygen and took medications for anxiety and depression, but there was no evidence her condition inhibited her ability to care for Child. Her daughter, P.D., lived with her. Neither . . . had a criminal record or been the subject of an OOCYS investigation. Both . . . held a valid driver's license. P.D. was employed as a patient transporter at a local hospital and was expecting to become a full-time assistant daycare teacher within two weeks of that hearing.
>
> Child lived with Paternal Grandmother for the first month after Child's birth because Mother was arrested for hitting Father at the hospital. Child then resided with Mother until January 2019, when Mother and Paternal Grandmother began to share physical

custody of Child in a rather loose, informal arrangement between them.

In early February, 2019, Mother decided she wanted to move to Las Vegas to establish a music career. Mother did not intend to take Child with her to Las Vegas; she wanted Child to live with Paternal Grandmother while she was gone.

Between January and mid-May, 2019, Paternal Grandmother would have custody of Child for five days and Mother would have custody of Child on weekends in some weeks; in other weeks, that arrangement would be reversed; and in other weeks, Paternal Grandmother would have custody of Child for three days and Mother would have custody of Child for four days. During this period of time, Mother and Child had been living with her mother, K.R. [(Maternal Grandmother).] Sometime in mid-May Mother abruptly left [Maternal Grandmother's] residence with Child and moved into a hotel for two weeks. Paternal Grandmother believed Mother left [Maternal Grandmother's] residence because [Maternal Grandmother] physically abused Child, including choking him.

On or about June 1 or 2, 2019, after living in the hotel for two weeks, Mother placed Child with Paternal Grandmother for the next six weeks and returned to [Maternal Grandmother's] residence. During that time, Mother did not contact Child for weeks[,] causing Paternal Grandmother to believe Mother had actually moved to Las Vegas.[FN]

_____
[FN] The record reflects inconsistencies and discrepancies regarding precise dates as to when Paternal Grandmother had physical custody of Child. That [P]aternal Grandmother had physical custody of Child for long periods, even weeks at a time, was not in dispute.

Trial Ct. Op. at 3-4 & n.1 (paragraph break added).

Meanwhile, on May 22, 2019, Mother filed a custody action against Father. At this time, Child was approximately five years old. This Court summarized in our prior memorandum:

On May 28[, 2019], Mother and [Father] entered into a custody agreement, filed in the court, which granted sole physical custody to Mother, while setting forth a holiday schedule. Custody Agreement, 5/22/19, at 1-2.

On July 29, 2019, Paternal Grandmother filed a petition to intervene in the custody action, a petition for modification of the custody order, and a petition for special relief. In these petitions, Paternal Grandmother averred that throughout June of 2019, Child had been in her care five days a week, and "for all of July[,] 7 days a week," as Child was abandoned by Mother. Paternal Grandmother's Petition to Intervene, 7/29/19, at 2. The petitions also averred that Child suffered physical abuse and neglect by Mother. *Id.*; Paternal Grandmother's Petition for Modification of a Custody Order, 7/29/19, at 2. Paternal Grandmother requested emergency custody of Child. Paternal Grandmother's Petition for Special Relief, 7/29/19, at 1. [In her modification petition, Paternal Grandmother also requested legal and physical custody.]

The court convened a hearing on Paternal Grandmother's petition for special relief on August 7, 2019. [Mother, Father, and Paternal Grandmother each appeared *pro se*.] Paternal Grandmother, her daughter P.D., Father, Mother, and Jessica Haldemann, an employee of [the Office of] Lehigh County Children and Youth Services [(OCYS)], testified. That same day, the court [granted] Paternal Grandmother's petition to intervene, finding that [she] both stood *in loco parentis* to the child, pursuant to 23 Pa.C.S. § 5324(2), and is the grandparent of a child not *in loco parentis*, whose relationship with Child began with the consent of the parents and Child was substantially at risk of abuse, pursuant to 23 Pa.C.S. § 5324(3) (statute discussed ***infra***). ***Id.*** at 1-2.

The trial court then convened a hearing on Paternal Grandmother's petition to modify custody on January 13, 2020. [Mother and Father each appeared *pro se*, and Paternal Grandmother was represented by counsel.] Paternal Grandmother, P.D., Mother, Father, Mother's paramour (J.W.), and [Maternal Grandmother] testified. At the conclusion of the hearing, the court examined the sixteen statutory custody factors, ***see*** 23 Pa.C.S. § 5328(a)(1)– (16), on the record, before awarding shared legal custody to Mother and Paternal Grandmother, primary physical custody to Mother, and partial physical custody to Paternal Grandmother. N.T., 1/13/20, at 132-43. On January 22, 2020, the court issued the underlying final

custody order memorializing the same, and additionally providing vacation and holiday scheduling. Order, 1/22/20, at 1-3.

On February 20, 2020, Mother filed a timely notice of appeal and concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

***L.M.V. v. A.T.D. v. M.R.D.***, 646 EDA 2020 (unpub. memo. at 1-3) (Pa. Super.

Nov. 3, 2020).

## II. Statement of Questions Involved & Standard of Review

Mother raises the following issues for our review:

1. Whether 23 Pa.C.S. § 5323(d) requires a trial court to provide a transcript of its reasons stated on the record.

2. Whether the trial court erred in granting Paternal Grandmother's Petition to Intervene under 23 Pa.C.S. § 5324(2) and (3)(iii)(B).[ ]

3. Whether the trial court abused its discretion by failing to consider whether the award of partial physical custody interfered with the parent-child relationship.

4. Whether the trial court abused its discretion by failing to apply the statutory presumption in favor of parents.

5. Whether the court abused its discretion by awarding shared legal custody . . . to Paternal Grandmother.

Mother's Brief at 5.[2]

---

[2] We have reordered the issues for ease of review. Mother notes that in her second issue, she has consolidated claims that were set forth separately in her Rule 1925 concise statement. ***See*** Mother's Brief at 5 n.1. We find her issues were sufficiently preserved for our review. ***See Krebs v. United Refining Company of Pennsylvania***, 893 A.2d 776, 797 (Pa. Super. 2006) (appellant waives issues that are not raised in both her Pa.R.A.P. 1925(b) statement and the statement of questions involved in her appellate brief). *(Footnote Continued Next Page)*

For ease of review, we now set forth the relevant standard of review and guiding principles. "Our paramount concern in child custody cases is the best interest of the child." ***M.A.T. v. G.S.T.***, 989 A.2d 11, 19 n.9 (Pa. Super. 2010) (*en banc*) (citation omitted).

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

***C.R.F. v. S.E.F.***, 45 A.3d 441, 443 (Pa. Super. 2012) (citation omitted).

> [T]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on

_____

Furthermore, we note Mother's fifth issue, as articulated in her statement of questions involved, challenged both the "shared legal and partial physical custody" award. Mother's Brief at 5. However, the corresponding heading in her argument section states, "The trial court abused its discretion in awarding **shared legal custody** to Paternal Grandmother." ***Id.*** at 61 (emphasis added). Neither this heading nor her discussion include any reference to the award of **physical** custody. ***See id.*** at 61-69. Accordingly, we deem any challenge to physical custody award waived. ***See*** Pa.R.A.P. 2119(a) ("The argument shall [include] such discussion and citation of authorities as are deemed pertinent."); ***C.H.L. v. W.D.L.***, 214 A.3d 1272, 1276 (Pa. Super. 2019) ("It is well-established that the failure to develop an argument with citation to, and analysis of, pertinent authority results in waiver of that issue on appeal.").

the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

***Ketterer v. Seifert***, 902 A.2d 533, 540 (Pa. Super. 2006) (citation omitted).

[A]lthough we are given a broad power of review, we are constrained by an abuse of discretion standard when evaluating the court's order. An abuse of discretion is not merely an error of judgment, but if the court's judgment is manifestly unreasonable as shown by the evidence of record, discretion is abused. An abuse of discretion is also made out where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence.

***M.A.T.***, 989 A.2d at 18-19 (citations omitted).

### III. Trial Court's Statement of Reasons

Previously, we considered Mother's first issue: whether 23 Pa.C.S. § 5323(d) required a trial court to provide a transcript of its reasons stated on the record. On November 3, 2020, we remanded the appeal for the trial court to file a Rule 1925(a) opinion, thus disposing of this issue.

### IV. Paternal Grandmother's Standing, 23 Pa.C.S. § 5324

In Mother's second issue, she challenges the trial court's granting standing to Paternal Grandmother to intervene in this custody matter. Mother avers the court erred in granting standing under **both** 23 Pa.C.S. § 5324(2) ("[a] person who stands *in loco parentis*") and § 5324(3)(iii)(B) ("[a] grandparent of the child who is not *in loco parentis*"), which she avers is contrary to the court's own findings of fact, as well as the plain language of the statute. Mother alleges:

- 7 -

> The record does not establish that Paternal Grandmother assumed a role equal to that of a parent in the eyes of a child, but does indicate that Paternal Grandmother's intervention was against Mother's wishes and interfered with the parent-child relationship. The record contains no evidence of parental abuse, [and contains] a specific finding that neither parent is a risk to the child.

Mother's Brief at 14 (citation to reproduced record omitted). We conclude no relief is due.

We note the relevant standard of review:

> An issue regarding standing is a threshold issue that is a question of law. Moreover, the interpretation and application of a statute is also a question of law. As with all questions of law, we must employ a *de novo* standard of review and a plenary scope of review to determine whether the court committed an error of law.
>
> When interpreting a statute, this court is constrained by the rules of the Statutory Construction Act of 1972 (the "Act"). 1 Pa.C.S. §§ 1501-1991. The Act makes clear that the goal in interpreting any statute is to ascertain and effectuate the intention of the General Assembly while construing the statute in a manner that gives effect to all its provisions. *See* 1 Pa.C.S. § 1921(a). The Act provides: "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b). Moreover, it is well settled that "the best indication of the General Assembly's intent may be found in a statute's plain language." Additionally, we must presume that the General Assembly **does not** intend a result that is absurd, impossible of execution, or unreasonable and **does** intend to favor the public interest over any private interest. *See* 1 Pa.C.S. § 1922(1) and (5). . . .

***G.A.P. v. J.M.W.***, 194 A.3d 614, 616-17 (Pa. Super. 2019) (some citations omitted).

Section 5324 of the Child Custody Act provides, in relevant part, standing to the following individuals to file an action for child custody:

> (2) A person who stands *in loco parentis* to the child.

(3) A grandparent of the child who is not *in loco parentis* to the child:

    (i) whose relationship with the child began either with the consent of a parent of the child or under a court order;

    (ii) who assumes or is willing to assume responsibility for the child; and

    (iii) when one of the following conditions is met:

        (A) the child has been determined to be a dependent child under 42 Pa.C.S. Ch. 63 (relating to juvenile matters);

        (B) the child is substantially at risk due to parental abuse, neglect, drug or alcohol abuse or incapacity; or

        (C) the child has, for a period of at least 12 consecutive months, resided with the grandparent, excluding brief temporary absences of the child from the home, and is removed from the home by the parents, in which case the action must be filed within six months after the removal of the child from the home.

23 Pa.C.S. § 5324(2), (3)(i)-(iii)(A)-(C).

In addressing standing, the trial court first summarized the history of Mother and Paternal Grandmother sharing physical custody of Child, along with Paternal Grandmother's belief that "Mother had actually moved to Las Vegas," in light of Mother's non-contact "for weeks." **See** Trial Ct. Op. at 3-4. The court further considered Paternal Grandmother's testimony at the August 7, 2019, standing hearing:

We [Paternal Grandmother and P.D.] are asking to receive emergency custody because we know how to give [Child] the proper care, love, and support he has been needing for a very long time. [Child] has been thriving

- 9 -

in our care this far within the past few months, and we have been preparing him to enter the school system which no one has been helping him with. We have been teaching him to be respectful and cared for as a household member, and I've been teaching him right from wrong as any other child should be, but without the abuse given by his mother [ ] and grandmother [K.R.].

Thanks to us, [Paternal Grandmother and P.D.][,] he's finally receiving the stability he was never given before with the schedules, appropriate meals throughout the day, educational readiness, proper hygiene, learning manners, and overall is learning how to be a kind, caring person more than he already is despite the abandoned, neglected abuse he has been given.

N.T. 8/7/19 at 5-6. No one disputed her statement. In fact, Mother said:

I made the decision to move [in approximately early February, 2019.] So I've been in the process of saving money and all this extra [sic]. Since then I've been saying back and forth to [Paternal Grandmother] that it was a possibility that I may be taking [Child] with me, that I didn't know what I wanted to do yet. But the closer the time came, you know, if he was going to be with anybody, I did want him indeed to be with his grandma because the way that they interact with him.

Like, I love the way they take care of [Child]. I don't have no objections to that. They're very caring. They're very loving. Like, he's learned a lot, not only from me, but from them as well. Like, I never had the plan on taking him out of their life at all.

N.T. 8/7/19 at 25.

Trial Ct. Op., 11/30/20, at 4-5.

The court further summarized:

On or about July 24, 2019, Paternal Grandmother reported [Maternal Grandmother] and Mother to [OCYS] when neither she nor Child had heard from Mother for weeks. She believed

- 10 -

[Maternal Grandmother] physically abused Child and Mother was unstable and had neglected to protect Child. Mother had no residence of her own; she resided with [Maternal Grandmother], moved into a hotel for two weeks when [Maternal Grandmother] allegedly abused Child and then returned to K.R.'s residence leaving Child with Paternal Grandmother. She believed Mother had failed to protect Child from [Maternal Grandmother's] abusive behavior. Also, Paternal Grandmother took Child to the doctor earlier in the year because Mother neglected to do so when Child was coughing, had difficulty breathing, had allergies and was experiencing some discharge from his penis. On another day, Paternal Grandmother believed Mother neglected Child when she took Child outside to a pool where he got a bad sunburn. Finally, Paternal Grandmother was concerned Mother may be going to jail because she understood Mother had two pending charges of driving while under the influence ("DUI") and an August 20 date to dispose of them.

When Mother learned Paternal Grandmother reported her and [Maternal Grandmother] to OCYS, she retrieved Child and threatened Paternal Grandmother that she would not see Child again unless she withdrew the allegations against her and [Maternal Grandmother.] Mother, who had returned to [Maternal Grandmother's] residence, had two other children and was concerned that OCYS would conclude they, too, would be at risk in [Maternal Grandmother's] residence.

At the August hearing, the OCYS caseworker confirmed its investigation was on-going and [Maternal Grandmother] was the alleged perpetrator. There were photographs of numerous bruises and recent scratches on the child's body. Mother testified at least two of the scratches were from [Maternal Grandmother.] Mother also testified she had decided not to move to Las Vegas. Finally, Father, who had never been involved in Child's life and had never requested any form of custody of Child, announced he wanted some custody because he had a good job and was going to have a place to live.

Trial Ct. Op. at 3-6.

The trial court clarified that its August 17, 2019, order should have reflected that Grandmother had standing under Section 5324 (person who

- 11 -

stands *in loco parentis*) or, **in the alternative**, under Section 5324(3)(i)(3)(1)(iii)(B). Trial Ct. Op. at 8. The court first set forth its analysis under Section 5324(2), which confers standing to "[a] person who stands in *loco parentis* to the child." ***Id.***, *citing* 23 Pa.C.S. § 5324(2). It reasoned this provision was "broad enough to include a grandparent who stood *in loco parentis* to the child." Trial Ct. Op. at 8. It found:

> Child has resided with Paternal Grandmother for long periods of time from early 2019 until June 1 or 2, 2019, after which Child resided exclusively with Paternal Grandmother [for] approximately six weeks[, until] Mother retrieved Child. Mother had only one interaction with Paternal Grandmother or Child during that time. Paternal Grandmother believed Mother had moved to Las Vegas and, consistent with her earlier discussions with Mother, believed Mother left custody of Child with her. During that time, Paternal Grandmother performed all of the parental functions for Child. She took Child to the doctor when Mother neglected to do so and reported to OCYS [that] Child had been abused. Paternal Grandmother stood *in loco parentis* to Child.

Trial Ct. Op. at 6.

The trial court then reasoned, pursuant to Section 5324(3)(iii)(B), which grants standing to a grandparent who is not in *loco parentis* to the child, where, *inter alia*, "the child is substantially at risk due to parental abuse, neglect, drug or alcohol abuse or incapacity." 23 Pa.C.S. § 5324(3)(i)-(iii)(A)-(B). The court found:

> Mother placed Child with Paternal Grandmother for lengthy periods of time between early 2019 and June 1 or 2, 2019, and thereafter for the next six weeks when Child resided exclusively with Paternal Grandmother. During those times, Paternal Grandmother assumed responsibility for Child and, as evidenced by her filing for legal and physical custody of Child, was willing to

continue to do so.  Father, who attended the hearing, was not a resource for Child and did not oppose Paternal Grandmother's request for custody.  OCYS' investigation of [Maternal Grandmother] as the alleged perpetrator was on-going. Photographs of Child [showed] bruises and scratches [that he sustained] while residing with Mother and [Maternal Grandmother] at [Maternal Grandmother's] residence.  Mother had no residence of her own.  She went to a hotel for two weeks when Child was allegedly abused by [Maternal Grandmother.] She then returned to [Maternal Grandmother's] residence without Child, who she left with Paternal Grandmother.  Furthermore, Mother had two outstanding DUIs, which exposed her to possible incarceration, and she indicated she intended to relocate to Las Vegas and leave Child . . . in Paternal Grandmother's custody.  At that point, there was evidence Child had physical injuries incurred while in Mother's custody and residing at [Maternal Grandmother's] residence; [Maternal Grandmother] was the perpetrator; OCYS's investigation was on-going; Mother's living situation was unstable; and Father had not been involved in Child's life.  Paternal Grandmother, who had physical custody of Child for significant portions of the previous seven months during which time Mother had neglected to contact Child or Paternal Grandmother for weeks at a time, was the only available resource other than OCYS to take custody of Child.  Paternal Grandmother met the requirements of 23 Pa.C.S. § 5324(3)(i)(ii) and (iii)(B).

Trial Ct. Op. at 7.

In response to Mother's statutory argument, that the trial court could not grant standing under the mutually inconsistent subsections of Section we conclude the court did not err in finding Paternal Grandmother had standing to intervene in this custody matter.  *See G.A.P.*, 194 A.3d at 616-17.  5324(2) **and** 5324(3)(iii)(C), the court clarified that it found standing under the first subsection, **or, in the alternative**, the latter.  We are satisfied the court did not intend to grant Paternal Grandmother's petition under **both** subsections, simultaneously.  As to the merits under each subsection, the court thoroughly

- 13 -

reviewed the cumulative underlying history of: Child living with Paternal Grandmother, both on a shared-time basis with Mother and on an exclusive basis; Paternal Grandmother's performance of "all of the parental functions for Child[;]" the allegations that Mother allowed Child to live with Maternal Grandmother, despite Maternal Grandmother's abuse of Child; Mother's lack of residence and potential imprisonment; and along with Father's prior inactivity in caring for Child. **See** Trial Ct. Op. at 6-7. Accordingly, we conclude the court did not err in finding Paternal Grandmother had standing to intervene in this custody matter. **See G.A.P.**, 194 A.3d at 616-17.

## V. Paternal Grandmother's Standing, 23 Pa.C.S. §§ 5325, 5328

In her third issue, Mother asserts that in awarding partial physical custody Paternal Grandmother, the trial court failed to consider whether the award interfered with the parent-child relationship, as required by 23 Pa.C.S. § 5328(c).

In order to review Section 5328(c), we first note Section 5325 addresses standing for, *inter alia*, grandparents who seek **partial** physical custody:

> **In addition to situations set forth in section 5324** (relating to standing for any form of physical custody or legal custody), grandparents . . . may file an action under this chapter for partial physical custody or supervised physical custody in the following situations:
>
> \*   \*   \*
>
> (2) where the relationship with the child began either with the consent of a parent of the child or under a court order and where the parents of the child:

(i) have commenced a proceeding for custody; and

(ii) do not agree as to whether the grandparents or great grandparents should have custody under this section; or

(3) when the child has, for a period of at least 12 consecutive months, resided with the grandparent or great-grandparent, excluding brief temporary absences of the child from the home, and is removed from the home by the parents, an action must be filed within six months after the removal of the child from the home.

*See* 23 Pa.C.S. § 5325(2)(i)-(ii), (3) (emphasis added).

Section 5328(c) then pertains to partial physical custody awards to a grandparent **who has standing under Subsection 5325(1) or (2)**:

(1) In ordering partial physical custody or supervised physical custody to a party **who has standing under section 5325(1) or (2)** . . . the court shall consider the following:

(i) the amount of personal contact between the child and the party prior to the filing of the action;

(ii) whether the award interferes with any parent-child relationship; and

(iii) whether the award is in the best interest of the child.

(2) In ordering partial physical custody or supervised physical custody to a . . . grandparent **who has standing under section 5325(3)**, the court shall consider whether the award:

(i) interferes with any parent-child relationship; and

(ii) is in the best interest of the child.*.*

23 Pa.C.S. § 5328(c)(1)(i)-(iii), (2)(i)-(ii) (emphases added).

Here, Mother acknowledges that because the trial court found Grandmother had standing to intervene in this custody matter under Section

5324, the "court was not required to consider whether its [custody] award affected Mother's relationship to the child" pursuant to Section 5328(c). Mother's Brief at 55. Nevertheless, Mother contends that "because it is evident that Paternal Grandmother did not have standing [under Section 5324], the lack of [consideration of Section 5328(c)] requires remand," where "Paternal Grandmother will bear the burden of proving that her claim of physical custody does **not** interfere with Mother's relationship to the child." *Id.*

Section 5325 provides standing to a grandparent, by its terms, "**[in] addition** to situations set forth in section 5324." 23 Pa.C.S. 5325. The requirements of Sections 5328(c)(1) and (2), for a trial court to consider whether a custody award interferes with any parent-child relationship, apply only to a grandparent who has standing under Sections 5325(1), (2), or (3). 23 Pa.C.S. 5325(c)(1)-(2). As Mother acknowledges, Section 5328(c)(1) and (2) make no reference to a grandparent who has standing under Section **5324**. *See id.*

As we affirm the trial court's order finding Paternal Grandmother has standing under Section 5324, we find no relief is due on Mother's argument that this matter must be remanded for a determination regarding Section 5325.

## VI. Presumption in Favor of Parent, 23 Pa.C.S. § 5327(b)

In her fourth claim on appeal, Mother avers the trial court failed to apply the Section 5327(b) presumption in her favor, against Paternal Grandmother. We note that subsection provides:

> In any action regarding the custody of the child between a parent of the child and a nonparent, there shall be a presumption that custody shall be awarded to the parent. The presumption in favor of the parent may be rebutted by clear and convincing evidence.

23 Pa.C.S. § 5327(b).

Mother cites the trial court's findings that both she and Paternal Grandmother have provided shelter, food, clothing, and education for Child, and that Mother has performed the parental duties of ensuring Child's safety and welfare. Mother's Brief at 49. Furthermore, the court found that neither Mother nor her paramour had been abusive, and credited Mother's decision to leave her mother's house when she believed Child was at risk. *Id.* at 50. Mother then maintains that under the Section 5328 presumption, she and Paternal Grandmother are not "on equal footing." *Id.* at 54. We conclude no relief is due.

The trial court addressed Mother's argument as follows:

> The order on appeal provided for shared legal custody to Mother and Paternal Grandmother; primary physical custody to Mother; and partial physical custody to Paternal Grandmother. Father was not a candidate for legal or physical custody. He had not been in Child's life and had never sought any form of custody. Decisions made by Mother did not entitle her to sole legal custody. She left Child with Paternal Grandmother and did not contact Paternal Grandmother or Child at all for weeks at a time, leaving Paternal Grandmother with the responsibility to perform all

- 17 -

parental duties. [Mother] neglected to take Child to the doctor. She overlooked, or made excuses for, scratches or bruises on Child's body while she and Child resided with [Maternal Grandmother.] Although [Mother] left [Maternal Grandmother's] residence when it appeared [Maternal Grandmother] had abused Child, she returned to [Maternal Grandmother's] residence while the OCYS investigation was still on-going. She planned to move to Las Vegas and leave Child behind in the custody of Paternal Grandmother. [Mother] had four DUIs in a six-month period and faced incarceration, eventually going to a 28-day residential rehabilitation program. By terminating any contact between Paternal Grandmother and Child because Paternal Grandmother would not withdraw her referral to OCYS, Mother was not only vindictive as to Paternal Grandmother, who had cared for Child and sought to protect him, but cut-off Child from a well-established, healthy relationship with Paternal Grandmother that Mother herself had created, encouraged and extolled. In essence, Mother abandoned Child except when it suited her and deprived Child of a relationship and environment that was more stable, safe, nurturing and consistent than the environment offered by Mother.

Trial Ct. Op. at 13-14.

Here, Paternal Grandmother sought primary legal and physical custody to protect Child from alleged abuse. In considering the Section 5327(b) presumption, the trial court did not find, as Mother advances on appeal, that that she is a capable parent who took reasonable steps to protect Child from harm. Indeed, Mother ignores the court's discussion, set forth above. Furthermore, Mother overlooks that the court granted her primary physical custody, while awarding Paternal Grandmother partial physical custody. Based on the trial court's discussion, we find no merit to Mother's argument that the court never addressed whether Paternal Grandmother successfully rebutted the presumption set forth in Section 5327(b) by clear and convincing

evidence. The evidence supports the trial court's conclusion that, through the evidence, Paternal Grandmother successfully rebutted such presumption.

## VII. Award of Shared Legal Custody to Paternal Grandmother

In her fifth issue, Mother asserts the trial court abused its discretion in awarding Paternal Grandmother shared legal custody. In support, she contends this award is "not supported by competent evidence of record," and the "court never provided any . . . explanation . . . why awarding shared legal custody to Paternal Grandmother was in the child's best interest." Mother's Brief at 61. Mother acknowledges that the "court evaluated each of the [Section 5328] custody factors in varying degrees of detail," but maintains "the trial court unevenly and inconsistently applied the custody factors, made factual findings directly contradicted by the evidence, and applied the parties' inability to resolve the matter . . . to Mother's detriment." *Id.* at 61, 63. Mother also presents the following arguments with respect to specific factors: (1) Factor 6 — where the court found Child's siblings "only lived with [him] for the past two weeks," Mother's paramour, J.W., testified "the siblings had lived with the child for most of their lives;" (2) Factor 8 ("the attempts of a parent to turn the child against the other parent") — the term "parent" should also extend "to all parties," and here, the court improperly disregarded Paternal Grandmother's conduct. *Id.* at 65-67.

As stated above, our standard of review of a custody order is abuse of discretion, "[w]e must accept findings of the trial court that are supported by competent evidence of record," and we defer to the court's findings of

credibility and weight of the evidence." ***C.R.F.***, 45 A.3d at 443. Upon petition, a trial court may modify a custody order if it serves the best interests of the child. 23 Pa.C.S. § 5338. Section 5328(a) sets forth the best interest factors that the trial court must consider. ***See E.D. v. M.P.***, 33 A.3d 73, 80-81, n.2 (Pa. Super. 2011). A court is required to consider all of these factors. ***J.R.M. v. J.E.A.,*** 33 A.3d 647, 652 (Pa. Super. 2011) (emphasis in original).

Section 5328(a) provides:

**(a) Factors.—**In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another.  A party's effort to protect a child from abuse byanother party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a)(1)-(16).  "[T]he only factors that should be given 'weighted consideration' are factors that 'affect the safety of the child[.]'" *M.J.M. v. M.L.G.*, 63 A.3d 331, 338 (Pa. Super. 2013).  Nevertheless, "[i]t is within the trial court's purview as the finder of fact to determine which factors are most salient and critical in each particular case." *Id.* at 339.

We incorporate the trial court's discussion of the facts, as well as its findings, as we have summarized above. We also consider the additional, thorough discussion the court provided in response to Mother's statutory-presumption argument:

Mother, [her paramour] J.W., their two children, and Child resided with [Maternal Grandmother] until [they all] left [Maternal Grandmother's] residence for the hotel in [May of 2019,] due to the bruises and scratches on Child['s] body. J.W. and his two children moved to Reading after staying in the hotel for a few days.

Child had turned six years old. In addition to [having] ADHD, he had an oppositional defiant disorder ("ODD"). Paternal Grandmother did not work; she received Social Security disability payments. P.D. continued to reside with Paternal Grandmother, had become a full-time assistant teacher at a daycare program and helped Paternal Grandmother care for Child. Father is bi-polar and has ADHD.

According to Pennsylvania's Common Pleas Case Management System ("CPCMS"), Mother stabbed J.W. in the chest with a knife during a domestic dispute over a cell phone in November 2015. Father said Child was present at that time. Mother was convicted of recklessly endangering another person, J.W., and sentenced to two years' probation. She violated her probation in 2017, was resentenced to 16 months of probation and appears to have successfully completed it. . . . J.W. testified he never knew Mother to be abusive. Mother did not disclose her conviction on her affidavit of criminal history filed on September 18, 2019.

At the August [7, 2019, standing] hearing Paternal Grandmother was under the impression Mother had two unresolved charges of DUI and may be going to jail in August. At trial, Mother admitted to having incurred four charges of DUI in the six-month period between January and July 2019 and completing a 28-day residential rehabilitation program on October 14, 2019. As of trial, Mother had not been sentenced. According to CPCMS, Mother was convicted of a first offense DUI (alcohol) in Northampton County on January 23, 2020 and sentenced to three

days to six months in the Northampton County Jail . . . and of three first offense DUI (controlled substance . . .) on January 28, 2020, and sentenced from 72 hours to six months in the Lehigh County Jail. . . .

At trial, Father testified [Maternal Grandmother] was abusive and an alcoholic. When Mother decided in early 2019 to move to Las Vegas to establish a music career for herself, she intended to do so without taking any of her children with her. The plan was for Child to remain in Paternal Grandmother's care, custody and control; that Paternal Grandmother would give Child a home, meet his special needs and feed and clothe him during the school year; and Child would "eventually" join Mother in Las Vegas during the summers and then permanently when Mother was settled. J.W. testified the plan was for him to take all three children to live with him in Reading while Mother was in Las Vegas. J.W.'s testimony was inconsistent with Mother's testimony and the fact that Mother utilized Paternal Grandmother rather than J.W. to care for Child when she could not. J.W.'s testimony was not credible. It was also significant that Mother utilized Paternal Grandmother rather than [Maternal Grandmother] to care for Child.

The explanations for the scratches on Child's . . . arm and face varied. According to Mother, [Maternal Grandmother] had grabbed Child and left a scratch on his arm but did not hurt him, and the scratches on his face were from Child playing with [Maternal Grandmother's] two dogs and cats. According to [Maternal Grandmother], Child fell off of a couch and her finger nails accidentally scratched Child's arm when she picked him up. According to Paternal Grandmother, Mother told her [Maternal Grandmother] admitted that she had choked Child, threw him on a couch, "punched him in his privates" and scratched Child because he had downloaded a game on her telephone without asking permission to do so. According to P.D., Child told her [Maternal Grandmother] scratched his face because [Maternal Grandmother] did not like the fact he had downloaded a game on her phone. Paternal Grandmother believed Mother's abrupt departure in [May of 2019] from [Maternal Grandmother's] residence with J.W. and the three children to the hotel confirmed Child had been abused while residing in [Maternal Grandmother's] residence.

During the two weeks Mother stayed in the hotel, Child spent about four nights a week at Paternal Grandmother's house and

the other nights with Mother at the hotel. After two weeks in the hotel, Mother returned to [Maternal Grandmother's] residence and left Child with Paternal Grandmother.

Mother acknowledged Paternal Grandmother and Child had, with Mother's approval, developed a close relationship with each other. Mother relied upon Paternal Grandmother to provide care for Child while she worked. Mother said "I like the way that she take[s] care of my son, like, teaching him, being playful with him all that, like, I love the relationship that they had . . .". N.T. 12/12/19 at 3.

Mother did not move to Las Vegas. Nonetheless, Child remained with Paternal Grandmother from June 1 or 2 until July 4, during which time Paternal Grandmother exercised full parental responsibility for Child except for one weekend when Mother exercised custody of Child. During that time Mother did not respond to Paternal Grandmother's repeated attempts to contact her. Paternal Grandmother expected Mother to exercise custody of Child on July 4 and was surprised when [Maternal Grandmother,] instead of Mother, came to her residence and retrieved him. Paternal Grandmother assumed Mother was in Las Vegas and had left the child with [Maternal Grandmother] or that Mother and Child were residing with [Maternal Grandmother.] Paternal Grandmother was concerned because she believed [Maternal Grandmother] had abused Child and Mother was incapable of protecting him from [Maternal Grandmother.]

Mother refused to let Paternal Grandmother see or talk with Child since she learned Paternal Grandmother had complained to OCYS. Mother conditioned any future contact by Paternal Grandmother with Child upon Paternal Grandmother withdrawing her allegations of abuse against [Maternal Grandmother.] Paternal Grandmother plausibly believed Mother wanted her to withdraw the allegations of abuse against [Maternal Grandmother] because the allegations jeopardized Mother's ability for her and her children to reside with [Maternal Grandmother.] At the time of the pre-trial conference on December 12, 2019, Mother and Child were living with [Maternal Grandmother] and Mother's other two children were living with J.W. in Reading. The two other children and J.W. moved back to [Maternal Grandmother's] residence with Mother and Child about two weeks before the January 13, 2020, trial.

Mother and Father never married. No one disputed Mother's representation that Father had been absent from Child's life for the past six years. He did not appear at the pre-trial conference on December 12, 2019. At trial he admitted, and Paternal Grandmother agreed, he had not been involved in Child's life for at least the previous year, although at trial he professed to wanting to have a relationship with Child going forward. At no time since Child's birth had Father sought any form of custody for himself. In fact, on May 22, 2019, when Mother filed her complaint for custody against Father, they entered into an agreement that was formally adopted by the court on May 28, 2019, that provided Mother with sole legal and sole physical custody of Child. At trial, Father said [Maternal Grandmother] was abusive, violent and an alcoholic who yelled at Child. He supported Paternal Grandmother's claim for custody. Paternal Grandmother testified she would facilitate Father being involved in Child's life if Father wanted to be.

Trial Ct. Op. at 9-13 (citations to Mother's criminal docket numbers omitted).

The trial court addressed each of the Section 5328(a) custody factors as follows:

1.) Party more likely to encourage and permit frequent and continuing contact between child and another party:

* * *

When Paternal Grandmother reported to OCYS Child had been abused, Mother refused to allow Paternal Grandmother to have any contact with Child for six months abruptly severing Child from a primary caretaker who, all evidence establishes, cared for and nurtured Child. There was no evidence Paternal Grandmother interfered with Mother's relationship with Child.

Further, Paternal Grandmother offered to provide a relationship between Child and Father when Father wanted to be involved with Child. She testified credibly that she would allow and encourage both parents to have a relationship with Child even without a court order.

Paternal Grandmother is clearly more likely than Mother to encourage and permit frequent and continuing contact between Child and both parents.

2.) Present and past abuse committed by a party or member of party's household; whether continued risk of harm to the child or an abused party; and which party can better provide adequate physical safeguards and supervision of child:

Child was abused, neglected or at risk of harm while residing with Mother and [Maternal Grandmother] in [Maternal Grandmother's] residence. He had multiple bruises and scratches his body. There was no evidence of any abuse of Child while in Paternal Grandmother's custody. Paternal Grandmother is better able to provide for the physical safety and supervision of Child.

2.1.) Child abuse and involvement with protective services:

OCYS investigated [Maternal Grandmother] as a possible abuser. It does not appear such abuse was established.

3.) Parental duties performed by each party on behalf of child:

Mother and Paternal Grandmother performed parental duties on behalf of Child. However, Paternal Grandmother is better able to do so. She is not employed. P.D. helps her. There was no evidence of abuse or self-harm, such as scratches or bruises, while [Child was] in Paternal Grandmother's custody.

4.) Need for stability and continuity in child's education, family life and community life:

Mother is unstable. She does not have her own residence; she resides with [Maternal Grandmother] and left [Maternal Grandmother's] residence for a hotel when Child presented with excessive bruises and scratches. She planned to move to Las Vegas without Child. When she left Child with Paternal Grandmother, she did not contact Paternal Grandmother or Child for days at a time. She had four DUIs between January and July 2019. She arbitrarily and vindictively severed Child's relationship with Paternal Grandmother, the one stable caretaker in his life, for six months after Paternal Grandmother reported [to] OCYS [that] Child had been abused and Paternal Grandmother refused Mother's demand she withdraw the charge. Mother was more

concerned about not jeopardizing her ability to reside in [Maternal Grandmother's] residence with Child and her two other children than having OCYS investigate whether Child had been abused within [Maternal Grandmother's] household.

Paternal Grandmother is stable. She has lived in her current residence for more than two years. As Mother stated, Paternal Grandmother and P.D. arc caring and loving and have taught Child a lot.

5.) Availability of extended family:

Paternal Grandmother's daughter, P.D., resides with her, is a teacher at a daycare facility, is involved with Child and helps care for him. All of the evidence, including Mother's own statements, demonstrates P.D. is a positive influence on Child.

Mother resides with her mother[.] It is telling that Mother planned to leave Child with Paternal Grandmother rather than with [Maternal Grandmother] when she planned to relocate herself to Las Vegas. However, Mother left Child with [Maternal Grandmother] for the 28 days ending October 14, 2019, when Mother was in a residential rehabilitation program. That was also the time Mother had severed Paternal Grandmother's contact with Child because Paternal Grandmother refused to withdraw her allegation Child had been abused in [Maternal Grandmother's] residence.

J.W. has been in Child's life since Child was one year and eight months old. He and Mother resided together with their two children and Child at [Maternal Grandmother's] residence until [May of 2019], when they left . . . and went to the hotel. After a few days at the hotel, he and his two children went with him to Reading. He testified, in direct contradiction to Mother's testimony, that the plan was for him to have custody of the three children, including Child, when Mother moved to Las Vegas. His testimony was not credible.

**6.) Child's sibling relationships:**

**Child has two half siblings: a three-year-old sister and a 1-year-old brother. Other than the fact the three children resided together in [Maternal Grandmother's] residence,**

**there was no testimony regarding the nature and quality of their relationship with each other.**

7.) Well-reasoned preference of child, based on child's maturity and judgment:

Child was not interviewed. Given his age, it did not seem productive to subject him to such inquiry[.]

**8.) Attempts of a parent to turn child against other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm:**

**There was no evidence either parent attempted to turn Child against the other parent. However, Mother terminated Child's well-established relationship with Paternal Grandmother.**

9.) Party more likely to maintain loving, stable, consistent and nurturing relationship with [C]hild given child's emotional needs:

Paternal Grandmother is more likely than Mother to maintain loving, stable, consistent and nurturing relationship with [C]hild given [C]hild's emotional needs. While Paternal Grandmother was meeting those needs, Mother had left Child with her for great lengths of time and even contemplated relocating to Las Vegas without Child.

10.) Party more likely to attend to the daily physical, emotional, developmental, educational and special needs of child:

Paternal Grandmother is more likely than Mother to attend to the daily physical, emotional, developmental, educational and special needs of [C]hild. She took Child to [the] doctor when Mother would not. She has been preparing Child for school. There was no evidence to the effect Child's ADHD or ODD presented significant challenges to the health or safety of Child while with Paternal Grandmother. The scratches and bruises about Child's body occurred while Child resided in [Maternal Grandmother's] residence. Child was out of control while residing in [Maternal Grandmother's] residence, even with Mother present. There was no such evidence while Child was in Paternal Grandmother's custody.

11.) Proximity of parties' residences:

Mother and Paternal Grandmother reside in Allentown, about ten minutes apart by automobile.

12.) Each party's availability to care for the child or make appropriate child-care arrangements:

Paternal Grandmother is available full-time and fully capable to care for Child. Between working, planning to relocate or otherwise not wanting to be with Child, Mother has utilized Paternal Grandmother to provide child care.

13.) Level of conflict between parties and their willingness and ability to cooperate with one another:

At trial, Mother expressed regret over her falling out with Paternal Grandmother and said it went too far.

14.) History of drug or alcohol abuse of party or member of household:

Neither Paternal Grandmother nor P.D. have any history of drug or alcohol abuse. Mother had four DUIs in the first six months of 2019, one for alcohol and three for controlled substances, and a 28-day stay at a residential rehabilitation program that ended on October 14, 2019. Father testified [Maternal Grandmother] was an alcoholic.

15.) Mental and physical condition of party or member of party's household:

There was no evidence that this factor was an issue.

16.) Any other relevant factors:

Mother continues to reside in [Maternal Grandmother's] residence where there is evidence of abuse, neglect and, perhaps, alcoholism. There was no such evidence in or about Paternal Grandmother's residence. Mother wisely utilized Paternal Grandmother rather than [Maternal Grandmother] or J.W. to take physical custody of Child and care for him for long, uninterrupted periods of time when Mother could not or would not care for him

and during which times Mother did not even contact Child or Paternal Grandmother to inquire of his welfare. In those instances, Mother essentially abandoned Child to Paternal Grandmother. The failure to provide Paternal Grandmother with any form of legal and physical custody of Child would have overlooked the relationship between Paternal Grandmother and Child that Mother herself began, expanded and extolled; the physical injuries Child suffered while in Mother's custody; and Mother's history of driving while under the influence of alcohol and drugs, and abandoning Child to Paternal Grandmother for long periods of time.

Trial Ct. Op. at 14-19 (emphases added).

After a careful review of the record, we find ample support in the trial court's analysis for its decision to award shared legal custody to Mother and Paternal Grandmother. The trial court engaged in the required custody best interest consideration, analyzed each of the custody/best interest factors under Section 5328(a), and, we note, found the majority of the factors weighed in favor of granting Paternal Grandmother shared legal custody. *See* 23 Pa.C.S. § 5328(a)(1)-(16). Additionally, we find unpersuasive Mother's arguments with respect to the factors at (a)(6) (the child's sibling relationships) and (a)(8) (a parent's attempts turn the child against the other parent). Whereas Mother cites the trial court's finding that Child's siblings "only lived with [Child] for the past two weeks," the court's discussion of (a)(6) made no such reference. *See* Mother's Brief at 65; Trial Ct. Op. at 16. The trial court acknowledged that the three children lived together, but pointed out "there was no testimony regarding the nature and quality of their relationship with each other." Trial Ct. Op. at 16. Mother offers no argument

to the contrary. ***See*** Mother's Brief at 65. Additionally, where Mother argues the term "parent," within the (a)(8) factor, should extend to Paternal Grandmother, the trial court **did** refer to her, in a manner tending to weigh against Mother: "Mother terminated Child's well-established relationship with Paternal Grandmother." ***See*** Trial Ct. Op. at 17. Indeed, Mother's discussion is wholly silent as to the trial court's repeated referenced to and consideration of Mother's "vindictive" action of taking Child from Paternal Grandmother and threatening to disallow any contact with Child until Paternal Grandmother withdrew her allegations to OCYS. Mother's citation to only the facts and findings favorable to her are not persuasive, when considered against the thorough discussion by the trial court. We conclude the trial court's custody order is supported by competent evidence of record, and accordingly affirm.

## VIII. Conclusion

As we conclude none of Mother's issues merit relief, we affirm the January 22, 2020, order granting: (1) shared legal custody to Mother and Paternal Grandmother; (2) primary physical custody to Mother; and (3) partial physical custody to Paternal Grandmother.

Order affirmed.

*Judgment Entered.*

Joseph D. Seletyn

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 5/12/2021*